Filed 12/17/13  P. v. Rios CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B245549 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BA384651) |
| NORMA RIOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Drew E. Edwards, Judge.  Affirmed.

Barbara S. Perry, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Ana R. Duarte and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Norma Rios was charged with murder.  (Pen.  Code, § 187, subd. (a).)[1] Following a jury trial, defendant was acquitted of first degree murder, convicted of second degree murder,[2] and sentenced to a term of 15 years to life.

On appeal, defendant contends the trial court erred in denying her requests to suppress her videotaped interview and give a voluntary manslaughter instruction. Finding no error, we affirm.

## BACKGROUND

During the early morning hours of May 18, 2011, Jose Antonio Melgar was beaten and kicked to death while sleeping on the sidewalk outside Service Employees International Union office in Los Angeles.  According to the building's surveillance videotape, Melgar was attacked by four individuals at 1:12 a.m.

The police were called when Melgar's body was discovered at about 7:50 a.m. Los Angeles Police Department Detective Christopher Linscomb responded to the call and determined from the building's surveillance videotape that Melgar was sleeping next to two companions when the attack occurred.  His companions were later identified as Jorge Pineda, who testified at the preliminary hearing but died before trial, and a man named "Sarco," who did not testify.[3]  The surveillance videotape showed that after Melgar was attacked, there was no "significant movement" until Pineda got up and left the area at 6:30 a.m., followed by Sarco 20 minutes later.

At 2:30 p.m. that same day, Officer Jessie Swartz and his partner responded to a report of a Hispanic female "sitting at the corner of Rampart and Temple."  At that

---

[1]    All further statutory references are to the Penal Code.

[2]    Defendant was also charged but acquitted of dissuading a witness.  (§ 136.1, subd. (b)(1).)

[3]    Both the surveillance videotape and Pineda's preliminary hearing testimony were admitted into evidence at trial.

location, the officers found defendant, who matched the description of the possible female suspect in this case, sitting next to Pineda.

Defendant was arrested as a possible suspect in this case and Pineda was detained for questioning. When a blood-stained tank top was found in defendant's pocket, defendant said, "I got in a fight and hit him with a brick." (The jury was informed that the blood on defendant's clothing did not come from Melgar.)

During Pineda's interview by Linscomb, Pineda named defendant and her son, Giovanni Rios (Giovanni),[4] as possible suspects in this case. Pineda also selected Giovanni's photograph from a six-pack lineup.

During defendant's interview by Lindscomb, Officer Rafael Lopez served as translator. Defendant's videotaped statements, which she sought to suppress at trial, are discussed below.

## I. Defendant's Videotaped Statements

During the pre-*Miranda*[5] portion of the interview, defendant was asked for her name, her parents' names, her birthplace, height, weight, age, and place of birth. She was also asked for the name, date of birth, address, phone number, and occupation of her son and her husband. She was then asked about her employment, Social Security number, telephone number, tattoos, government benefits, prior addresses, arrest record, driver's license or California identification number, friends' names, and history of drug use.

After defendant answered the above questions, she was advised of her *Miranda* rights and asked whether she understood those rights. She answered yes.[6]

---

[4]     Defendant's son, Giovanni, is referred to in the record as Giovanni or Jovanni. Because defendant and her son have the same last name, we will refer to her son as Giovanni.

[5]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[6]     At trial, Linscomb testified that he had "offered" defendant an "express waiver" of her *Miranda* rights but did not obtain one.

3

Defendant was then shown a photograph of Melgar and was asked if she knew him. Defendant initially denied knowing him, but then stated that his name was Tony (Melgar)[7] and that he took his recyclables to the recycling center at Temple and Rampart.

Defendant claimed she was attacked by Melgar at 9:00 p.m. the previous night at Beverly and Coronado (the location where Melgar was killed several hours later). She stated that Melgar, who appeared to be very drunk, had suddenly grabbed, beaten, and kicked her. She suffered an injury to her head, which Lopez examined and described on the videotape as a "big cut and a big bump."[8]

Defendant gave varying accounts of her activities the previous day. She initially said that at 4:00 p.m., a man named Flaco had given Melgar some whiskey and vodka, which had caused Melgar to go "crazy" and hit her. She later said that Flaco had offered her a drink at 4:00 p.m., but Melgar was not present. She then said that after being attacked by Melgar, she went to a friend's house and put some paper on her head, which was bleeding. When she left her friend's house, her eyesight was blurry. She walked around for a while and bought a beer at about 4:00 p.m. and then had something to eat.

At this point during the interview, defendant complained of feeling dizzy. The interview resumed after Lopez replied, "We won't be here that long, okay?"

Defendant stated that after being attacked by Melgar, she was afraid for her life. She took a blanket and went to sleep in some bushes near Coronado and the freeway. She did not wake up until 7:30 a.m. that morning.

Lopez told defendant that she was lying. He told her that she had been seen throwing bricks at Beverly and Coronado, and several witnesses had identified her as the person who "was throwing bricks and assaulted" Melgar. Defendant admitted she was angry about being assaulted and had started throwing bricks about 20 minutes after the assault occurred.

---

[7]    Although defendant referred to Melgar as Tony, we will refer to him as Melgar for the sake of consistency.

[8]    Lopez testified at trial that his description of a "big cut and big bump" was a "fair portrayal of the injury [he] saw on the back of [defendant's] head."

4

Lopez told defendant that there was a surveillance videotape of the attack on Melgar. He told her that she was visible on the videotape with the three men who had beaten Melgar.

Defendant admitted being present when Melgar was attacked, but claimed she did not see anything because her back was turned. She explained that she had gone back to ask Melgar why he had beaten her. While they were talking, three men arrived and began kicking him. She did not know who they were, but she thought they looked like gang bangers.

Defendant was shown a photograph (without being told the photograph was of her son Giovanni) and was asked, "Is that one of them?" She replied, "It's one of them, but I do not recognize him."

At that point, Detective Motto entered the room with defendant's cell phone, which had been taken from her when she was arrested. Motto told the officers that defendant had used her phone to call her son Giovanni around the time of the attack on Melgar. Motto also told the officers that defendant's cell phone number was the same number that Giovanni had listed during his December 2010 arrest.

Defendant was then asked the following questions about her son: "[Lopez] Do you remember that you told us the name of your son? [¶] [Defendant] Yes. [¶] [Lopez] Mira, what is that name? Do you know that name? [¶] [Defendant] Yes. [¶] [Lopez] What is your son's name? [¶] [Defendant] The name is uh . . . Gio. [¶] [Lopez] Yes. The name of your son, that you told us, is Giovanni Rios, right? [¶] [Defendant] Yes. [¶] [Lopez] What do you think this name is here? That says, Giovanni Rios. You just told me that that is one of the guys that beat him up. [¶] [Defendant] No, I didn't say that."

Defendant was asked for Giovanni's date of birth. She replied, "two, two, ninety" (Feb. 2, 1990). She was asked why she did not identify Giovanni's photograph right away. She replied, "Because I can't see and I'm still hurting and my eyesight is blurry."

Defendant was told that the police were aware of the following facts: (1) defendant and Giovanni were on the surveillance videotape of the killing;

5

(2) defendant told Giovanni "what Tony [Melgar] did to" her; (3) defendant went with Giovanni to find Melgar; and (4) defendant told Giovanni, "that's the one," "[k]ill that mother fucker."

Defendant denied the above statements were true. She was then told, "You came back with three guys and you told them, that's him. And those three men beat him up and killed him. Do you understand? You are on video. Do you understand? . . . Your son is on the video." "We know everything." "They heard you say, there is that mother fucker, kill him. All the people that hang out there on Beverly and Coronado saw it." "Why would you get your son involved in that? . . . He got angry when you explained to him, 'son, I was beaten up.' Did he get angry? What did he say when you told him?"

Defendant denied telling Giovanni that Melgar had beaten her. She stated that Giovanni's friend had probably told him about her beating.

Defendant was asked whether the cell phone number that Giovanni had listed during his prior arrest was her cell phone number. She replied that Giovanni had two cell phones, but she had none. She claimed that she called him "from the street."

Defendant was shown the cell phone that was found in her possession when she was arrested. She was told, "No, you called him from this phone." "Before they beat up Tony you called your son on this phone, okay? This phone that is here, that he gave when he was previously arrested." Defendant replied, "Yes, because he, he, my phone was stolen and this same number is the one I told my son to put it for me." "[T]his used to be the number he had before."

Defendant eventually stated that she had called her son to ask for money: "[Lopez] Why did you call your son before they beat up Tony? [¶] [Defendant] I called my son? [¶] [Lopez] Yes. You still called him. We can show you here, that you called him. [¶] [Defendant] Yes, yes, I called him. . . . Because I wanted him to bring me money. . . . I called him because I was hungry and I needed money."

Defendant blamed Giovanni's friends for attacking Melgar. She said that although Giovanni was "really angry, like really angry," Giovanni did not participate in the beating. "And I told him, Gordo [Giovanni's nickname], let's go. Mommy, okay.

6

That's all he said." She denied telling Giovanni to beat up Melgar: "I did not say, that mother fucker. The one who said that was the other one," the one who wears his hair in a "Mohawk."

Defendant was asked to start over and tell the truth about what happened. She replied, "I just saw when they kicked him." She stated that while "the other one" was beating Melgar, she grabbed and hugged her son and left with him.

Defendant repeatedly denied telling her son that she had been beaten by Melgar, and repeatedly denied her son's involvement in the attack on Melgar: "No, my son did not beat Tony up. I told you who beat him up. The guy that has the hair like this, here, like this."

After declaring that her son did not participate in the attack on Melgar, defendant complained that her head hurt: "I'm tired. The back of my head hurts. My brain is opened. It is almost open, like this. I am getting dizzy, I feel bad."

However, defendant continued talking and recounted the following conversation with her son: "No, I said, no, no, baby, nobody has beaten me up. [Y]es, he said. But he had already been told. . . . [M]ommy, he said, should I call an ambulance for you? I said, no, God alone will heal me. [¶] [Lopez] When did you tell him finally, when did you tell him that Tony had beaten you up? [¶] [Defendant] No, his friend told him, told my son."

The interview ended several moments later with defendant's final denial: "[Lopez] You are going to continue, continue with this story, that you did not tell Giovanni? [¶] [Defendant] I did not tell him. [¶] [Lopez] You did not tell him? [¶] [Defendant] No."

After the interview was over, defendant asked for a "pill," stating, "I feel bad." Defendant was given some water and transported to jail.

## II. Pineda's Preliminary Hearing Testimony

The prosecution's evidence at trial included defendant's videotaped statements and Pineda's preliminary hearing testimony.[9] Pineda testified at the preliminary hearing as follows:

Pineda knew both Tonito (Melgar) and defendant (whom he identified in court at the preliminary hearing) for 20 years. Pineda saw defendant's son "Jovanni" (Giovanni) "every now and then."

On the night of the killing, Pineda drank four beers and some vodka before he fell asleep on the sidewalk near Beverly and Coronado. He woke up when Melgar arrived and asked for a blanket. He gave Melgar a blanket and they both went to sleep near a man named Sarco.

During the night, defendant came by with Giovanni and a third person. Defendant told Giovanni that Melgar was the "son of a bitch" or "puto that hit me, kill him." After defendant and Giovanni "hit [Melgar] in the head" and gave Melgar "a couple kicks," defendant told Giovanni to "hit him with the block." Giovanni hit Melgar with a "block of cement" and said, "Why did you hit my mother? I'm going to kill you[.]" Giovanni was going to hit Pineda but defendant "told him not to."

Later that day, Pineda spoke with defendant near the recycling center on Temple and Coronado. Defendant threatened to have "her buddies" "come after" Pineda because he had seen "what happened." Defendant warned Pineda "not to talk" to the police.

## DISCUSSION

On appeal, defendant challenges the trial court's denials of her (1) motion to suppress her videotaped statements, and (2) request for a voluntary manslaughter instruction. Additional facts relevant to her contentions are discussed below.

---

[9] The admissibility of Pineda's prior testimony is not at issue on appeal. (Evid. Code, § 1291, subd. (a)(2).)

8

**Defendant's Videotaped Statements**

During trial, defendant moved to suppress her videotaped statements on the following grounds: First, the officers used a "deliberate question first technique to elicit incriminating statements from [defendant] before advising her of her <u>Miranda</u> rights. They then improperly used these incriminating statements to elicit more incriminating statements from her after a <u>Miranda</u> advisement," in violation of *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*). Second, defendant was impaired by the effects of a concussion and therefore lacked the capacity to knowingly and voluntarily waive her *Miranda* rights.[10]

## I. The Question First Technique

Outside the presence of the jury, the trial court heard Officer Lopez's testimony concerning the question first technique. Lopez testified that during the pre-*Miranda* phase of the interview, defendant was only asked to provide biographical information for herself, her son, and her spouse. According to Lopez, these were foundational questions "that would typically be asked as part of the booking process" and, because they were unrelated to the crime itself, did not require a *Miranda* warning.[11]

After hearing Lopez's testimony, the trial court held that the pre-*Miranda* questions did not constitute an interrogation and, therefore, no *Miranda* warning was required for that phase of the interview. The trial court stated: "In this particular situation involving Ms. Rios, questions were asked about family members, friends, phone

---

[10] Defendant also argued below that information obtained from a warrantless search of her cell phone was used to elicit incriminating responses. However, the opening brief does not challenge the search of defendant's cell phone.

[11] Lopez later testified at trial that the following interrogation techniques were used in this case: (1) discuss other topics before giving a *Miranda* warning; (2) convince the suspect the evidence of guilt is overwhelming, even though no such evidence exists; (3) refuse to accept the suspect's denials or statements of innocence; (4) accuse the suspect of lying; and (5) empathize with the suspect that things may have gotten out of control.

9

numbers and addresses. I would note there were no questions asked about the circumstances of this case. In my view the facts of Ms. Rios' case, this case, are quite a bit different than the facts of the *Seibert* case. I don't believe there is any sort of interrogation . . . pre-*Miranda* which is meant to elicit an incriminating response."

On appeal, defendant contends, as she did below, the pre-*Miranda* questions constituted an improper custodial interrogation. Specifically, she argues that because the officers were aware that her son was a suspect in the killing, the pre-*Miranda* questions concerning her son's name and phone number were designed to "establish her connection to the other suspect in the crime." (Internal record reference omitted.) Defendant argues: "The only time appellant told the officers her son's name, date of birth, and phone number was during the pre-*Miranda* questioning. After she was Mirandized, the officers repeatedly adverted to the pre-*Miranda* information she had provided about her son to challenge her responses to their questions. [¶] Lopez acknowledged that the phone number Motto said Giovanni gave to police was the number of the phone appellant had when she was arrested, and therefore she could not have called that number from her phone. The only other phone number for Giovanni that was discussed during the interrogation was the number appellant provided during the pre-*Miranda* portion of the interrogation." (Internal record references omitted.)

For the reasons that follow, we conclude that no *Miranda* warning was required for the initial phase of the interview.

### A. General Miranda Principles

In *People v. Andreasen* (2013) 214 Cal.App.4th 70, the appellate court set forth the following general principles concerning the *Miranda* rule.

"To protect the constitutional privilege against self-incrimination, the *Miranda* rule requires that before the police may question the defendant during a custodial interrogation, the defendant must be advised of the right to remain silent and to an attorney and that any statements may be used against him or her in court. (*People v. Gomez* (2011) 192 Cal.App.4th 609, 627.) If the defendant invokes the right to silence or

to an attorney, the interrogation must cease. (*People v. Davis* [(2009)] 46 Cal.4th [539,] 585.)

"Generally, statements elicited in violation of these *Miranda* principles may not be used against the defendant at trial (*People v. Gomez*, *supra*, 192 Cal.App.4th at p. 627), . . . ). This exclusionary rule is applied in prophylactic fashion to deter coercive investigative questioning and advance the trustworthiness of trial evidence, even if the defendant's statements were voluntary apart from the *Miranda* violation. (See *Smith v. Illinois* (1984) 469 U.S. 91, 95, fn. 2, 99, fn. 8; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

"The prophylactic *Miranda* protections are triggered only if a defendant is subjected to a custodial interrogation. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) Interrogation refers not only to express questioning, but also to its functional equivalent; i.e., "'any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" (*Pennsylvania v. Muniz* (1990) 496 U.S. 582, 600-601 (*Muniz*), italics added.) However, not all police questioning of a person in custody constitutes interrogation. (*People v. Franzen* (2012) 210 Cal.App.4th 1193, 1201.) The exclusion for communications 'normally attendant to arrest and custody' recognizes that the police may properly perform their normal administrative duties that are *distinct from their investigatory function* without giving rise to *Miranda* protections. (*Muniz*, *supra*, 496 U.S. at pp. 600-602; see *People v. Hall* (1988) 199 Cal.App.3d 914, 921 . . . .)

"For example, under the '"routine booking question" exception' to the *Miranda* rule, the police need not provide *Miranda* warnings prior to asking routine booking questions to secure biographical information. (*Muniz*, *supra*, 496 U.S. at pp. 601-602; see *People v. Quiroga* (1993) 16 Cal.App.4th 961, 967; *People v. Hall*, *supra*, 199 Cal.App.3d at p. 921.) Also, the *Miranda* requirements are generally not implicated when the police ask questions related to safety concerns that arise during the arrest or booking process. (*People v. Gomez*, *supra*, 192 Cal.App.4th at pp. 634-635 [*Miranda* not

triggered during routine booking question about gang affiliation designed to ensure safety of jail placement]; *People v. Jones* (1979) 96 Cal.App.3d 820, 827-828 [*Miranda* not triggered by arrest question related to defendant's medical condition].)  Similarly, casual conversations or 'smalltalk' unrelated to the offense do not typically constitute a *Miranda* interrogation.  (*People v. Gamache* (2010) 48 Cal.4th 347, 388; *People v. Lewis* (1990) 50 Cal.3d 262, 274-275; *People v. Franzen*, *supra*, 210 Cal.App.4th at pp. 1201-1203 . . . .)

"The fact that information gathered from these routine questions or casual conversations turns out to be incriminating does not alone render the statements inadmissible.  (See *People v. Gomez*, *supra*, 192 Cal.App.4th at p. 629.)  This principle excluding routine or casual communications from *Miranda*'*s* coverage can apply even when a defendant has already received *Miranda* warnings and invoked his or her rights. (*U.S. v. Foster* [(2000)] 227 F.3d [1096,] 1103-1104; *Commonwealth of Pennsylvania v. Abdul-Salaam* [(1996)] 678 A.2d [342,] 350-351.)

"However, a *Miranda* interrogation may emerge during routine or casual exchanges if the police ask questions '"that are designed to elicit incriminatory admissions."'  (*Muniz*, *supra*, 496 U.S. at p. 602, fn. 14; see *People v. Gomez*, *supra*, 192 Cal.App.4th at p. 627.)  For example, the *Muniz* court held that although a defendant's confused manner of answering routine biographical questions was admissible to prove his intoxication at the time of his arrest for drunk driving, the defendant's inability to answer a more specific question about his birth date that went beyond a routine booking question was inadmissible.  (*Muniz*, *supra*, 496 U.S. at pp. 585-586, 592-593, 598-602 [due to absence of *Miranda* warnings, defendant's inability to state the date of his sixth birthday was inadmissible to show confused mental state]; see *U.S. v. Hinckley* (D.D.C. 1982) 217 U.S. App.D.C. 262 [672 F.2d 115, 118-126] [due to *Miranda* violation, prosecution could not rebut insanity defense with defendant's responses to federal agents' investigatory questioning about defendant's social, employment, educational, and medical background].)

"The courts caution that the facts of any routine questioning or casual conversation must be carefully scrutinized to ensure that the police are not using the communication as a pretext for eliciting incriminating information. (See *People v. Gomez*, *supra*, 192 Cal.App.4th at p. 630.) This cautious approach is particularly appropriate when a defendant has invoked his or her *Miranda* rights before the communication. (*U.S. v. Foster*, *supra*, 227 F.3d at p. 1103 ['conversations occurring after a person invokes his or her *Miranda* rights must be viewed with suspicion and introduced at trial only with the utmost caution'].) When evaluating whether the *Miranda* requirements should apply during noninvestigative routine or casual exchanges, relevant factors to consider include the nature of the questions, the context of the questioning, the knowledge and intent of the officer asking the questions, the relationship between the questions and the crime, the administrative need for the questions, and any other indications that the questions were designed to elicit incriminating evidence. (*People v. Gomez*, *supra*, 192 Cal.App.4th at pp. 630-631.)

"On appeal from the denial of a *Miranda* exclusionary motion, we defer to the trial court's factual and credibility findings if supported by substantial evidence, and independently determine whether the challenged statements were illegally obtained. (*People v. Ochoa*, *supra*, 19 Cal.4th at pp. 401-402; *People v. Gomez*, *supra*, 192 Cal.App.4th at p. 627.)" (*People v. Andreasen*, *supra*, 214 Cal.App.4th at pp. 86-88, fn. omitted.)

### B.      *What Constitutes an Interrogation*

According to the California Supreme Court, an interrogation "'consists of express questioning, or words or actions on the part of the police that "are reasonably likely to elicit an incriminating response from the suspect.'" (*People v. Cunningham* [(2001)] 25 Cal.4th [926,] 993, quoting *Rhode Island v. Innis* [(1980)] 446 U.S. [291,] 301.) 'Interrogation thus refers to questioning initiated by the police or its functional equivalent, not voluntary conversation. [Citation.] "'Volunteered statements of any kind are not barred by the Fifth Amendment . . . .'"" (*People v. Thornton* (2007) 41 Cal.4th

391, 432, quoting *Rhode Island v. Innis*, at p. 300.) Consequently, the police 'may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.' (*People v. Clark* (1993) 5 Cal.4th 950, 985.)

"Under these rules, smalltalk is permitted. Thus, we have concluded that a detective who told a defendant during booking that he 'looked "like a traffic ticket"' and asked '"Is it just a warrant?"' was not engaged in an impermissible custodial interrogation. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1034.) [The deputy's] remarks [in this case] were even more innocuous; objectively, there was no reason to suspect that inquiring about Gamache's military service would lead Gamache to volunteer his regret about failing to kill Peggy Williams or the other inflammatory remarks that followed. [The deputy's] subsequent '"neutral inquir[ies]"' did not convert Gamache's volunteered admissions into the product of interrogation. (*People v. Ray* (1996) 13 Cal.4th 313, 338.) The trial court did not err in admitting them." (*People v. Gamache*, *supra*, 48 Cal.4th at pp. 386-387.)

"In *Rhode Island v. Innis*[, *supra*,] 446 U.S. 291, the Court defined the phrase 'functional equivalent' of express questioning to include 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.' *Id.* at 301 (footnotes omitted) . . . . However, '[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining' what the police reasonably should have known. *Innis*, *supra*, at 302, n. 8. Thus, custodial interrogation for purposes of *Miranda* includes both express questioning, and also words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to 'have . . . the force of a question on the accused,' [citation], and therefore be reasonably likely to elicit an incriminating response." (*Muniz*, *supra*, 496 U.S. at pp. 600-601.)

14

*C.     Analysis*

Defendant contends that because the pre-*Miranda* questions were designed to establish both her parental relationship with her son, who was a suspect in this case, and his phone number, the officers were engaged in an impermissible custodial interrogation during the first phase of the questioning. We are not persuaded.

The record shows that defendant was arrested because she fit the description of the possible female suspect. During the pre-*Miranda* questioning, she was asked for the names and phone numbers of her family members. Her responses—her son's name and telephone number—were not incriminating and the officers had no basis to believe that these biographical questions would call for an incriminating response.

Defendant contends that the biographical questions were improper because the officers were able to use her responses—her son's name and phone number—to challenge her failure to identify her son's photograph. However, such use of her earlier responses was not a *Miranda* violation. "The fact that information gathered from these routine questions or casual conversations turns out to be incriminating does not alone render the statements inadmissible. (See *People v. Gomez*, *supra*, 192 Cal.App.4th at p. 629.)" (*People v. Andreasen*, *supra*, 214 Cal.App.4th at p. 88.)

We conclude that because the pre-*Miranda* questions may not reasonably be construed as calling for an incriminating response, no *Miranda* warning was required at the initial phase of the interview.

**II.     The Post-*Miranda* Questioning Did Not Violate *Seibert***

Defendant contends her post-*Miranda* statements were inadmissible under *Seibert*. We conclude the contention lacks merit.

The issue in *Seibert* was the validity of a "question first" interrogation technique. In that case, the officers elicited a confession before giving a *Miranda* warning and obtaining the defendant's repeated confession. As *Seibert* explained, the question first technique "calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally

15

inadmissible, since taken in violation of *Miranda v. Arizona*, [*supra*,] 384 U.S. 436, the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time. The question here is the admissibility of the repeated statement. Because this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda's* constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible." (*Seibert*, *supra*, 542 U.S. at p. 604.)

Seibert is clearly distinguishable. As we previously noted, the pre-*Miranda* questioning in this case did not elicit an incriminating response or confession. Notwithstanding Officer Lopez's testimony that the interview was designed to elicit a confession,[12] the information obtained during the pre-*Miranda* questioning (the son's name and phone number) was not incriminating. Accordingly, there was no violation of *Seibert*.

## III. There Was a Valid *Miranda* Waiver

Defendant contends the prosecution failed to establish that she knowingly and voluntarily waived her *Miranda* rights. We disagree.

### A. *The Requirements of a Valid Miranda Waiver*

According to *Berghuis v. Thompkins* (2010) 560 U.S. 370, 382-383, "Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement. [*North Carolina v.*] *Butler* [(1979) 441 U.S. 369,] 373. The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the

---

[12]     *Ante*, footnote 11.

16

consequences of the decision to abandon it.' [*Moran v.*] *Burbine* [(1986) 475 U.S. 412,] 421."

The prosecution "does not need to show that a waiver of *Miranda* rights was express. An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence. *Butler*, *supra*, at 376. *Butler* made clear that a waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.' 441 U.S., at 373. The Court in *Butler* therefore 'retreated' from the 'language and tenor of the *Miranda* opinion,' which 'suggested that the Court would require that a waiver . . . be "specifically made."' *Connecticut v. Barrett*, 479 U.S. 523, 531-532 (1987) (Brennan, J., concurring in judgment).

"If the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights. [Citation.] The prosecution must make the additional showing that the accused understood these rights. [Citations.] Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.

"Although *Miranda* imposes on the police a rule that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a *Miranda* warning, see *Burbine*[, *supra*, 475 U.S.] at 427, it does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights. As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford. See, *e.g.*, *Butler*, *supra*, [441 U.S.] at 372-376; [*Colorado v.*] *Connelly* [(1986) 479 U.S. 157], 169-170 ('There is obviously no reason to require more in the way of a "voluntariness" inquiry in the *Miranda* waiver context than in the [due process] confession context'). The Court's cases have recognized that a waiver of *Miranda* rights need only meet the standard of *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). See *Butler*, *supra*, at 374-375; *Miranda*,

17

*supra*, [384 U.S.] at 475-476 (applying *Zerbst* standard of intentional relinquishment of a known right).  As *Butler* recognized, 441 U.S., at 375-376, *Miranda* rights can therefore be waived through means less formal than a typical waiver on the record in a courtroom, cf. Fed. Rule Crim. Proc. 11, given the practical constraints and necessities of interrogation and the fact that *Miranda's* main protection lies in advising defendants of their rights, see *Davis* [*v. United States* (1994)] 512 U.S. [452,] 460; *Burbine*, 475 U.S., at 427."  (*Berghuis v. Thompkins*, *supra*, 560 U.S. at pp. 384-385.)

  *B.* *Defendant Made a Knowing, Intelligent, and Voluntary Waiver*

  Defendant argues that because she was interviewed while intoxicated and suffering the effects of a concussion, she lacked the capacity to knowingly, intelligently, and voluntarily waive  her *Miranda* rights.  Defendant also contends the trial court failed to inquire whether the circumstances of her interrogation, including the officers' decision to avoid seeking an express *Miranda* waiver, precluded a finding that the *Miranda* warnings were effective.  We disagree.  We conclude the record supports the trial court's finding that defendant knowingly, intelligently, and voluntarily waived her *Miranda* rights.

    1. <u>The Concussion Evidence</u>

  Outside the presence of the jury, the respective medical experts—Dr. Ponton for the prosecution and Dr. O'Connor for the defense—testified as to the effects of defendant's concussion on her ability to knowingly, intelligently, and voluntarily waive her *Miranda* rights.  Both experts based their conclusions on (1) a nurse's report prepared when defendant received medical attention at the jail at 10:00 p.m. on the night of her arrest, and (2) defendant's videotaped interview statements.

  *The Prosecution's Expert*.  Dr. Ponton testified that based on his review of the nurse's report and defendant's videotaped interview statements, it was "more likely than not" that defendant had suffered a concussion.  Because there was no evidence of a loss of consciousness, Dr. Ponton believed that defendant had suffered a grade one

18

concussion. Based on defendant's videotaped statements, Dr. Ponton found that defendant was not confused and was able to understand the questions that were posed during the interview. Dr. Ponton saw nothing in the videotape that would lead him to believe that defendant did not understand the *Miranda* rights that were read to her. It was clear, in his view, that defendant "could understand what she was being asked. She was responding appropriately."

Dr. Ponton further noted that during the videotaped interview, defendant "was trying to provide stories filling up time. She was thinking on the spot. She was trying to provide exculpatory versions of the events." He concluded from the manner in which she presented herself that she would have responded to the questions in the same way even in the absence of a head injury.

As to defendant's difficulty in providing personal information, Dr. Ponton stated: "Whenever she had to provide her personal information that identified herself, she had difficulties. She did not have any difficulty identifying her son's date of birth, her son's name, her son's phone number, her boyfriend's full name and address, her boyfriend's phone number, the name of the employer. Whenever information was asked of her that involved other people, she was able to provide it just like that. When she was asked about her date of birth, her age, her name, she always hesitated and had problems providing that information. [¶] Q How did that strike you in entering your opinion so far as possible confusion? [¶] A I felt that she was not forthcoming with personal information."

*The Defense Expert*. Dr. O'Connor testified that based on his review of the nurse's report, defendant was still intoxicated when she was examined by a nurse at the jail at 10:00 p.m. on the night of her arrest. He believed, based on his review of the nurse's report and the videotaped interview, that defendant had suffered a grade two concussion. In Dr. O'Connor's view, defendant's difficulty in answering basic questions (the spelling of her last name and date of birth) and her complaints of blurred vision, headache, and not feeling well were consistent with a grade two concussion.

19

However, Dr. O'Connor testified that there was nothing in the videotaped interview that would lead him to conclude that defendant did not understand the *Miranda* rights that were read to her or the questions that followed.

### 2. The Trial Court's Ruling

In concluding that defendant was able to understand her *Miranda* rights, the trial court stated: "I listened to the testimony of Dr. Ponton, Dr. O'Connor, and Officer Lopez. Just to summarize briefly. Dr. O'Connor testified, in his belief, at the time of the interview, Ms. Rios had suffered what he believed to be a grade two concussion. Dr. Ponton testified, in his belief, the concussion was a level one concussion. Dr. O'Connor indicated that he could not opine whether or not with the grade two concussion Ms. Rios was or was not able to understand the *Miranda* warnings given. I don't find that leads me to believe even if Ms. Rios had suffered a grade two concussion, there is no evidence produced before me that Ms. Rios was not able to understand the *Miranda* warnings and the questioning of her during the actual interview. I find Dr. Ponton's opinion to be more credible than Dr. O'Connor's. Over the objections of the defense, I am going to find that the statements given by Ms. Rios during the *Miranda* interview were knowing and voluntary, and that would be my ruling."

### 3. Defendant's Contentions on Appeal

Defendant contends that by relying on Dr. O'Connor's inability to determine whether the concussion had rendered her incapable of understanding her *Miranda* rights, the trial court erroneously shifted the burden of proof to defendant. We disagree. The trial court found the prosecution had met its burden, through Dr. Ponton's expert testimony, to establish a knowing, voluntary, and intelligent wavier of defendant's *Miranda* rights. We conclude the trial court's reliance on Dr. Ponton's testimony was proper and did not shift the burden of proof to defendant.

Defendant next contends, for the first time on appeal, that Dr. Ponton's testimony was insufficient to support the trial court's ruling because Dr. Ponton lacked the

20

necessary medical experience to determine whether she understood her *Miranda* rights. The problem with this contention, however, is that defendant did not raise it below and, therefore, failed to preserve the issue for appeal. (Evid. Code, § 353, subd. (a) [a finding shall not be reversed based on the erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"].)[13]

Finally, defendant contends that because the trial court denied her exclusionary motion on the ground that the pre-*Miranda* questions were not meant to elicit incriminating statements, "the court never undertook an inquiry into the question of whether the circumstances of appellant's interrogation, including the officers' decision not to seek a waiver of rights from appellant, precluded a finding that the *Miranda* warnings were effective. Absent such an inquiry by the court, the statement was inadmissible, and the conviction must be reversed." (Citing *Edwards v. Arizona* (1981) 451 U.S. 477, 484.) Defendant's reliance on *Edwards* is misplaced. In that case, the defendant invoked the right to have counsel present during custodial interrogation. Where the right to counsel is invoked, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." (451 U.S. at p. 484.) Because in this case the right to counsel was not invoked during custodial interrogation, *Edwards* is inapplicable. Based on our review of the record, we are satisfied that substantial evidence supports the trial court's finding that defendant knowingly, intelligently, and voluntarily waived her *Miranda* rights.

---

[13]  In her reply brief, defendant urges us to treat the Attorney General's failure to address her insufficiency argument as a concession that her insufficiency argument is correct. We decline to do so. The sole case cited in support of her position, *Smith v. Williams* (1961) 55 Cal.2d 617, 621, is distinguishable because it involved an appeal from a judgment following the sustaining of a demurrer. Because the appellant in *Williams* was not attempting to object to the admission of evidence for the first time on appeal, the case is not relevant to our inquiry.

## Voluntary Manslaughter

The trial court has a sua sponte duty to instruct on a lesser included offense when the record, viewed in the light most favorable to the defendant, contains substantial evidence to support the instruction. (*People v. Barton* (1995) 12 Cal.4th 186, 194-195.) Manslaughter is a lesser included offense of murder. "Voluntary manslaughter is an unlawful killing without malice 'upon a sudden quarrel or heat of passion.' (§ 192, subd. (a).) 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citation.]' (*People v. Barton*[, *supra*,] 12 Cal.4th [at p.] 201.) '[T]he killing must be "upon a sudden quarrel or heat of passion" (§ 192); that is, "suddenly as a response to the provocation, and not belatedly as revenge or punishment. Hence, the rule is that, if sufficient time has ela[ps]ed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." [Citation.]' (*People v. Daniels* (1991) 52 Cal.3d 815, 868.)" (*People v. Hach* (2009) 176 Cal.App.4th 1450, 1458.)

Defendant contends the trial court erroneously refused to instruct on voluntary manslaughter based on a heat of passion defense. She relies on *People v. Beltran* (2013) 56 Cal.4th 935, in which the Supreme Court upheld the voluntary manslaughter instruction that was given in that case, stating: "Provocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' [Citation.]" (*Id.* at p. 957.) *Beltran*, however, did not involve a four-hour interval between the provocation and the killing. The evidence of provocation in that case showed at best that the killing was committed during a sudden quarrel.

In this case, on the other hand, there was a four-hour interval between Melgar's assault on defendant at 9:00 p.m. and defendant's assault on Melgar at 1:00 a.m. The

22

trial court found the killing was not a voluntary manslaughter because the four-hour interval had provided a sufficient cooling-off period for passion to subside and reason to return. The record supports that finding. The evidence showed the assault on Melgar was motivated by revenge for a beating inflicted on defendant several hours earlier. In addition, defendant's act of recruiting others to assist in Melgar's killing is compelling evidence of planning and is inconsistent with an act that is committed rashly or without reflection. Because there was no substantial evidence of a sudden heat of passion, the voluntary manslaughter instruction was properly refused.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SUZUKAWA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

23